IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

HELIBERTO CHI,                          §
                                        §
          Petitioner,                   §
                                        §
                                        §
VS.                                     §   NO. 4:06-CV-227-A
                                        §
DOUGLAS DRETKE, Director,               §
Texas Department of Criminal            §
Justice, Institutional                  §
Division,                               §
                                        §
          Respondent.                   §

MEMORANDUM OPINION
and
ORDER

     Came on for consideration the petition for writ of habeas

corpus ("petition")[1] filed by Heliberto Chi ("Chi"), an inmate in

the Texas Department of Criminal Justice, Institutional Division,

who is under sentence of death.  The court has determined that

the petition should be denied for the reasons set forth in this

memorandum opinion and order.

I.

Procedural History

     On June 26, 2001, an indictment was filed against Chi for

the murder of Armand Paliotta ("Paliotta") while in the course of

committing or attempting to commit aggravated robbery.  Pursuant

to the jury's answers to the special issues set forth in Texas

---

[1]While the undersigned recognizes that 28 U.S.C. § 2254 contemplates the
filing of an "application" for writ of habeas corpus, the practice of the
Northern District of Texas has long been instead to use the term "petition."
Consistent with this now ingrained practice, the undersigned refers to Chi's
application under 28 U.S.C. § 2254 for writ of habeas corpus as the "petition"
and uses the term "petitioner" in lieu of "applicant."

Code of Criminal Procedure Article 37.071, §§ 2(b) and (e), the judge of the Criminal District Court Number Three of Tarrant County, Texas, sentenced Chi to death.  The Texas Court of Criminal Appeals affirmed his conviction on May 26, 2004.  See Chi v. State, No. 74,492 (Tex. Crim. App. May 26, 2004).  On November 15, 2004, the Supreme Court denied Chi's petition for writ of certiorari.  See Chi v. Texas 543 U.S. 989 (2004).

In July 2004, Chi initiated state-habeas proceedings in the trial court.  On February 28, 2005, the trial court adopted and entered the State's proposed findings of fact and conclusions of law recommending that state-habeas relief be denied.  On April 27, 2005, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied Chi habeas relief. Chi then filed this federal habeas petition through his current counsel, Wes Ball.

II.

Underlying Facts

A.   The State's Evidence

The Court of Criminal Appeals well summarized the facts of the crime as follows:

> In the late afternoon of March 24, 2001, Chi entered the K&G Men's Store in Arlington and approached one of the employees.  She recognized him as a former employee of the store.  He questioned her about whether there were policemen on duty in the store and whether they were uniformed or in plain clothes.  He also asked how many employees were working that day and she pointed them out.  Chi then had a discussion with the manager, Armand Paliotta, and the assistant manager, Gloria Mendoza, in which he asked for, and was provided, the phone number of one of the employees.  Chi remained in

2

the store about 30 minutes before leaving.  The store
closed at 7 p.m.  Paliotta, Mendoza, and another
employee, Adrian Riojas, remained to attend to closing
duties.  Paliotta counted the money and prepared the
bank bag for deposit, and Mendoza and Riojas shut down
the computers and completed closing matters.  Around 8
p.m., Chi knocked on the front door of the store and
Paliotta unlocked the door and let him in.  Chi stated
that he had left his wallet in the tailor shop at the
back and went to look for it.  The others finished
their closing duties and waited for Chi at the front of
the store.  Paliotta, who was holding the bank bag,
held the door open and prepared to set the alarm.  As
Chi reached the front doors, he pulled out a gun and
told them to get back inside the store.  Riojas went
first, followed by Mendoza, and then Paliotta.  Chi
took the bank bag from Paliotta and told the three to
go to the back of the store.  As they were walking,
Paliotta pushed Chi and began running to the front of
the store.  Chi ran after him and then stopped and
fired at him.  When he turned around, Riojas and
Mendoza began running.  Riojas ran into the warehouse,
pursued by Chi.  Riojas quickly found himself trapped
by various locked doors.  When he saw Chi approaching
with his gun drawn, he began to run in a different
direction.  Chi shot Riojas in the back as Riojas was
running from him.  After Riojas fell, Chi stated,
"Quedate apagado," which means, "Stay dead," in
Spanish.

In the meantime, Mendoza ran toward the front of the
store.  She checked on Paliotta and saw that he had
been shot.  She called 911.  Before talking to anyone,
she heard the doors from the warehouse open so she set
the phone down and hid beneath a rack of clothes.  She
could hear Chi's footsteps walking toward her and she
heard Chi say, "Vente para frente," which means, "Come
to the front," in Spanish.  Mendoza remained where she
was.  After at least ten minutes, Mendoza came out from
beneath the rack and checked on Paliotta again.  She
could no longer detect any breathing.  She returned to
the phone to attempt to talk to someone at 911 and
heard a conversation taking place between Riojas and
the operator.  The police arrived and Riojas and
Mendoza ran outside.  Paliotta died from a gunshot
wound to the back.  Riojas survived.

<u>Chi v. State</u>, No. 74,492, slip op. at 3-5.

3

At the punishment phase, the State tied Chi to a series of of other crimes and bad acts, including:

- On March 2, 2001, Chi was involved in the robbery of a convenience store.  Chi and an accomplice robbed the clerk at gunpoint, tied and gagged her, and stole approximately eight thousand dollars in cash and checks;

- In June of 1998, Chi stole a laptop computer from Nations Bank in downtown Dallas.  He was able to steal the laptop because he worked for a courier service at the time and was given an access card to the bank work area;

- While employed as a sheetrock worker, Chi altered the amount of the checks from his employer, changing one check from $100 to $700 and another from $130 to $930. He laughed when he was fired;

- In a case that is still pending, Chi has been charged with grand theft auto;

- In 1997, Chi spat and cursed at a security officer and called him by a racial slur;

- Erica Sierra, whom Chi previously dated, traveled with Chi to California after the murder of Paliotta.  She said that Chi stated that he would pay anyone to kill Mendoza, because she had seen him shoot Paliotta and Riojas.  She also said that she did not think that Chi was sad about committing the murder.  Further, Chi was very abusive toward Sierra; and

- Chi had been in the United States illegally since 1995.

There was also evidence that, while incarcerated and awaiting trial, Chi continued to pose a threat to others.  For example, he cursed at two officers, threatening one with physical violence, claiming that he had "nothing to lose."  He also cursed at fellow inmates, striking one repeatedly in the face.  Also, etchings on the inside of his prison door suggested that Chi may have carried a sharp instrument into his cell.

4

Alonso Enriquez, who met Chi while they were locked up together in county jail, testified that Chi spoke of the evening when he murdered Paliotta without remorse. Indeed, according to Enriquez, Chi admitted that he did not feel anything about the shootings. He said that a "stupid man" opened the door. He mocked Riojas for crying when he shot him. Chi boasted that, even if he were convicted, he was going to get out some way or another. And, when he did, he was going to mutilate a former girlfriend and also get Erica Sierra, who had turned him in to authorities.

Finally, John Murphy, a court bailiff, testified that he had worked with thousands of inmates and believed that Chi is a dangerous individual. In fact, Chi got into a scuffle with Murphy while he was trying to put restraints on him. Murphy said that he had never before had to lay his hands on an inmate.

B.  Chi's Evidence

Chi's evidence consisted of two witnesses, S.O. Woods, a retired worker from the Texas Department of Criminal Justice, and John Sorenson, a college-research criminologist. Woods testified generally about how inmates are classified and how the prisons are designed for security. On cross-examination, he stated that he was aware from reviewing Chi's jail record that, while in prison, Chi had requested books about the Texas Seven, a group of prison escapees who murdered a police officer after escaping. He conceded that this might be a tip-off to Chi's state of mind. Sorenson testified that the likelihood that Chi would commit

5

future acts of violence is 27.8 percent.  His testimony, however,
also faltered on cross-examination.  By way of example only,
under Sorenson's model, Ted Bundy would have scored lower than
Chi on future dangerousness.

III.

Scope of Review

On April 24, 1996, the President signed into law the
Antiterrorism and Effective Death Penalty Act of 1996, Pub. L.
No. 104-132, 110 Stat. 1214 ("the AEDPA").  Under the AEDPA, the
ability of federal courts to grant habeas relief to state
prisoners is narrowly circumscribed:

> (d)  An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the judgment
> of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the
> claim--
>
> > (1)  resulted in a decision that was
> > contrary to, or involved an unreasonable
> > application of, clearly established Federal
> > law, as determined by the Supreme Court of
> > the United States; or
> >
> > (2)  resulted in a decision that was
> > based on an unreasonable determination of the
> > facts in light of the evidence presented in
> > the State court proceeding.

AEDPA, § 104(3) (codified at 28 U.S.C. § 2254(d)).

The AEDPA further provides:

> (e)(1)  In a proceeding instituted by an
> application for a writ of habeas corpus by a person in
> custody pursuant to the judgment of a State court, a
> determination of a factual issue made by a State court
> shall be presumed to be correct.  The applicant shall
> have the burden of rebutting the presumption of
> correctness by clear and convincing evidence.

6

AEDPA § 104(4) (codified at 28 U.S.C. § 2254(e)(1)).

Having reviewed the petition, the response, the record, and applicable authorities, the court finds that none of Chi's grounds has merit.

IV.

Grounds for Relief

Chi urges four grounds in support of his petition.[2]  They are as follows:

Ground One:     Chi was deprived of his right to be informed of his rights under the Vienna Convention on Consular Relations ("the Vienna Convention") and to contact a consular official from his home country and the failure to so advise him rendered Chi's statement to a law enforcement official inadmissible.

Ground Two:     Chi received ineffective assistance of counsel:

(1)  Trial counsel rendered ineffective assistance of counsel by failing to present evidence in mitigation of the death penalty that petitioner was remorseful concerning his participation in the death of the victim; and

(2)  Trial counsel rendered ineffective assistance of counsel by failing to present evidence to rebut prosecution evidence concerning future dangerousness in a confinement setting.

Ground Three:   Significant error occurred during Chi's trial due to the conduct of a trial official, namely a court reporter that encouraged applicant to engage in improper behavior in the presence of jurors during jury selection, thereby violating Chi's rights to due process.

Ground Four:    The death penalty scheme in Texas is unconstitutional under the Equal Protection Clause of the United States Constitution based on the

---

[2]Although Chi urged two separate grounds on the basis of ineffective assistance of counsel for a total of five grounds, the court has combined those two grounds into one with two subsections.

lack of standards to guide prosecutors regarding
whether to seek death.

V.

Discussion

A.   Ground One: The Vienna Convention

Chi contends that as a citizen of Honduras he was entitled
upon arrest to be advised of his right to contact a consular
official from his home country under the Vienna Convention.
Because he was not so advised, Chi urges that the trial court
erred by admitting into evidence certain statements that he made
to a law enforcement officer during a strip search.  See Chi's
Federal Habeas Pet. at 6.  The gist of Chi's statements was that,
though he had been at the crime scene to participate in the
robbery, someone else had committed the shootings.  See 34 Tr.[3]
at 45-46.

As correctly found by the trial court and subsequently also
by the Texas Court of Criminal Appeals in Chi's state-habeas
proceedings, Chi's failure to raise his complaint under the
Vienna Convention on direct appeal renders it procedurally
defaulted.  See State Habeas Record ("HR") at 226-229 (State's
Proposed Finding of Fact No. 13 and Conclusions of Law Nos. 1-6);
HR at 257 (February 28, 2005, Order of trial court adopting all
of State's proposed findings of fact and conclusions of law); see
also Ex parte Chi, No. 61,600-01 (Tex. Crim. App. April 27, 2005)

---

[3]A copy of Chi's state-court records was forwarded to the court on May
26, 2006.  The "Tr." reference is to the court reporter's record of the
transcribed, state-trial proceedings.  Citations to "Tr." are preceded by
volume number and followed by the relevant page number(s).

(Texas Court of Criminal Appeals adopting trial court's finding and conclusions).

This prior finding of procedural default precludes federal-habeas review of this ground:

> We now make it explicit: In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Here, Chi has made no attempt to show either cause for his default, resulting prejudice from his default, or that failure to consider this ground will result in a fundamental miscarriage of justice.  Nor does it appear that Chi could given the overwhelming other evidence of his guilt.  Indeed, the court concurs with respondent's confusion over how statements wherein Chi denied committing the murders could even be prejudicial.  See Resp't's Federal Answer at 21 (emphasis added).

Further, Chi's assertion that a claim under the Vienna Convention cannot be procedurally defaulted is incorrect.  The Supreme Court has specifically held that claims under the Vienna Convention can be procedurally defaulted just as constitutional

claims.  See Breard v. Greene, 523 U.S. 371, 375-77 (1998).[4]
Chi's first ground is therefore denied as procedurally defaulted.

Even if it not procedurally defaulted, Chi's claim under the
Vienna Convention would fail on the merits for several reasons.
By way of example, the Fifth Circuit has held that the Vienna
Convention does not confer individually enforceable rights.  See,
e.g., Cardenas v. Dretke, 405 F.3d 244, 253 (5th Cir. 2005).
Further, a showing of prejudice is a prerequisite to relief under
the Vienna Convention.  See Rosales v. Bureau of Immigration and
Customs, 426 F.3d 733, 737-38 (5th Cir. 2005), cert. denied,
U.S.   , 126 S.Ct. 1055 (2006), (regardless of whether
petitioner's right under the Vienna Convention are protected
under the United States Constitution, petitioner was not entitled
to any relief because he had not shown prejudice from the failure
to advise him of his right to contact the Mexican consulate); see
also Breard, 523 U.S. at 377 ("Even were Breard's Vienna
Convention claim properly raised and proved, it is extremely
doubtful that the violation should result in the overturning of a
final judgment of conviction without some showing that the
violation had an effect on the trial.") (citation omitted).
Again, Chi has not shown any prejudice from any violation of the

---

[4]Without citation to any legal authority of the United States, Chi urges
that recent opinions by the International Court of Justice "clearly trump the
decision in Breard."  See Chi's Federal Habeas Pet. at 10.  The court declines
Chi's bare invitation to disregard Supreme-Court precedent.  In addition,
Chi's reliance on Medellin v. Dretke, 544 U.S. 660 (2005) rings hollow.  In
Medellin, the Supreme Court dismissed writ of certiorari as improvidently
granted.  As Chi himself concedes, Breard is thus the last word by the Supreme
Court on this subject.  See Chi's Federal Habeas Pet. at 10.  And, under
Breard, Chi's claim is procedurally defaulted.

Vienna Convention and would be hard pressed to do so given the compelling evidence of his guilt of a capital offense and the litany of other bad acts he committed before and during his incarceration.

B.    Ground Two: Ineffective Assistance of Counsel

In order to prevail on an ineffective assistance of counsel ground, Chi must show (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceedings would have been different. Strickland v. Washington, 466 U.S. 668, 687 (1984).  Both prongs of the Strickland test must be met to demonstrate ineffective assistance. Id. at 697.  To establish the first prong, Chi must overcome a strong presumption that his counsels' conduct falls within the wide range of reasonable professional assistance. Id. at 689.  It is not enough to show that some, or even most, defense lawyers would have handled the case differently. Green v. Lynaugh, 868 F.2d 176, 178 (5th Cir. 1989).  For the second prong, Chi must show that his counsel's errors were so serious as to "deprive him of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687.[5] Because Chi is challenging a death sentence, the question is

_____

[5]If Chi cannot show that the ineffectiveness of his counsel deprived him of a substantive or procedural right to which the law entitles him, then he must show that the result of the proceeding was fundamentally unfair or unreliable. Williams v. Taylor, 529 U.S. 362, 391-93 (2000) (discussing Lockhart v. Fretwell, 506 U.S. 364 (1993), and Nix v. Whiteside, 475 U.S. 157 (1986)).

whether there is a reasonable probability that, absent the errors, the jury--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.  Id. at 695.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. Williams v. Taylor, 529 U.S. 362, 391 (2000).

    1.   Failure to present evidence that petitioner was remorseful

    Chi's first ineffective assistance of counsel claim is that his trial lawyers, William Harris and Paul Connor, should have called Chi's brother, Jose Hernan Aceituno, to testify during the punishment phase of trial.  Aceituno purportedly would have testified that Chi, following his arrest, called him and tearfully and remorsefully confessed to causing the death of the victim.  Chi urges that this testimony was important mitigating evidence.  See Chi's Federal Habeas Pet. at 11-16.

    Chi's trial counsel, however, under oath, assert that Chi consistently instructed them not to call his brother to testify, notably over their strong recommendation that they do so for the very purpose of showing Chi's remorse.  Moreover, Chi vehemently denied ever making any sort of confession to his brother.  In light of Chi's instruction that Aceituno not be called to testify and further concerned that Aceituno's testimony might be untrue given Chi's denial of it, Chi's counsel decided not to call Aceituno as a witness.  See HR at 107-115.

12

Because Chi does not dispute any of these assertions by his trial counsel, this ineffective assistance of counsel claim borders on frivolous.  As well stated by the Fifth Circuit: "By no measure can [defendant] block his lawyer's effort and later claim that the resulting performance was constitutionally deficient."  Autry v. McKaskle, 727 F.2d 358, 361 (5th Cir. 1984).  Likewise, the failure to present possibly perjured testimony cannot give rise to an ineffective assistance of counsel claim.  A lawyer's duty to his client is "limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth."  See Nix v. Whiteside, 475 U.S. 157, 166 (1986).

In short, Chi has failed to demonstrate that his counsels' performance fell below an objective standard of reasonableness by not calling Aceituno to testify.  To the contrary, the uncontroverted evidence is that the performance of his counsel was more than reasonable in this regard.  Given the almost irrefutable evidence of Chi's guilt coupled with all the other evidence of his bad acts before, up to, and including trial, Chi has likewise failed to demonstrate a reasonable probability that, had Aceituno testified, the result of the proceedings would have been different.  Strickland, 466 U.S. at 687.  Neither prong of Strickland is thus met.  This claim is denied.

2.   Failure to rebut prosecution evidence concerning future
     dangerousness in a confinement setting

Chi's second and final ineffective assistance of counsel claim is equally without merit.  Here, Chi claims that his trial counsel performed deficiently by not calling a fellow inmate, Terry Ellis, to testify in favor of Chi's version of an altercation with a prison guard, Deputy Michael Weldegebril.  See Chi's Federal Habeas Pet. at 19-23.  The guard had testified that Chi threatened him over a piece of mail.  Id. at 20.  After reviewing the stated reasons by trial counsel as to why, after a thorough investigation, the decision was made not to call Ellis, the court readily concludes that trial counsels' performance was more than reasonable on this issue as well.

For example, Ellis could not rebut the portion of the officer's testimony that Chi said to him: "Look you mother-fucker, I have nothing to lose."  Further, Ellis claimed that the altercation between Chi and the officer ensued, because the officer had a thick accent and was hard to understand.  But, in reality, the officer was quite understandable.  Also, Ellis would certainly have been impeached over his seven felony convictions.  In addition to tainting his credibility, these convictions also could have, based on how Ellis was in and out of prison, caused the jury to believe that a life sentence was not really a life sentence.  Finally, this officer's testimony concerned only one incident in a barrage of bad-act evidence presented by the prosecution, including, an attack on a bailiff, three other jail infractions, Chi's plan to reap revenge on a girlfriend (against whom he had previously been physically violent), his plan to

14

mutilate another woman, and his boasting to a fellow inmate about
shooting a cowering and crying second victim.  <u>See</u> HR at 112-13.
Against this back-drop, it was trial counsels' quite reasonable
and seemingly correct view that: "[T]he limited ability of Mr.
Ellis to contradict a portion of Mr. Weldegebril's testimony
would have only redirected the jury's attention to this
comparatively average bad act, and would have been conspicuously
impotent in its effect." <u>Id.</u> at 113.

     "[S]trategic choices made after thorough investigation of
law and facts relevant to plausible options are virtually
unchallengeable . . ." <u>Strickland</u>, 466 U.S. at 690.  Such is the
case here.  Trial counsels' performance was not deficient.
Moreover, there is no reasonable probability that, had a
convicted felon testified on this relatively minor incident, the
result of the proceedings would have been different.  <u>Id.</u> at 687.
Chi's second ineffective assistance of counsel claim is denied.

C.   <u>Ground Three: The Court Reporter</u>

     In what Chi aptly describes as bizarre, he next complains
that his due process rights were violated when the court reporter
flirted with him during jury selection and caused him, in turn,
to act inappropriately.  <u>See</u> Chi's Federal Habeas Pet. at 16-19.
Specifically, two officers assigned to assist with security
during Chi's capital-murder trial witnessed the court reporter
and Chi making eye contact and smiling at one another.  At one
point, Chi was seen seductively eating a piece of candy while
looking at her.  She smiled back at him.  Concerned about the

15

situation, the officers conducted a thorough search of Chi's cell
and the room where voir dire was being conducted.  They found a
note, in the court reporter's handwriting, under Chi's chair:
"CAN I TRUST YOU?"  See HR at 74.

The matter was brought to the attention of the presiding
judge.  The judge found that there was not an issue concerning
the integrity of the record and that jury selection should
continue.  Id. at 75.  Because she had been a long-time employee,
the judge further asked all involved to keep the matter quiet so
her reputation would not be ruined.  Id. Another court reporter
concluded the trial.  See 13 RR at 68-69.  Finally, the trial
judge denied Chi's motion for mistrial over this issue.  Id. at
69.

While both parties acknowledge the dearth of case law
involving an incident like this one, both parties appear to agree
that, for a constitutional violation to have occurred, some
resulting harm to Chi must be shown.  For example, Chi likens the
court reporter's misconduct to prosecutorial misconduct where the
"the standard is whether the misconduct 'so infected the trial
with unfairness as to make the resulting conviction a denial of
due process.'"  See Chi's Federal Habeas Pet. at 19 (quoting
Darden v. Wainwright, 477 U.S. 168, 181 (1986)).  Though
emphasizing that extrajudicial contact amongst jurors is more
serious than the incident here, respondent urges that cases even
involving that more serious scenario require "a showing that the
conduct prejudiced the rights of defendant or compromised the

16

jury."  See Resp't's Federal Answer at 41 (citing United States
v. Burke, 496 F.2d 373, 377-78 (5th Cir. 1974)).

Here, there is no evidence that Chi's defense was in any way
compromised by the court reporter's actions or by his actions in
response.  Indeed, there is no evidence that any of the jurors
even saw the conduct in question.  Consequently, this ground is
without merit.

D.    Ground Four: The Texas Death Penalty
      Scheme Is Unconstitutional

Lastly, Chi urges that the death-penalty scheme in Texas is
unconstitutional under the Equal Protection Clause, because of
the lack of standards to guide prosecutors regarding whether to
seek the death penalty.  See Chi's Federal Habeas Pet. at 23-28.

This argument was summarily rejected in his state-habeas
proceeding based upon a number of Texas cases holding that a
prosecutor's discretion to seek the death penalty is not
unconstitutional.  See HR at 237, ¶ 2.  The Supreme Court denied
certiorari in each of these cases where certiorari was sought.
Id.  Chi, however, urges that the death-penalty scheme in Texas
has recently been rendered unconstitutional by Bush v. Gore, 531
U.S. 98 (2000) and its holding that the Constitution "requires
that there be 'uniform' and 'specific' standards to prevent the
arbitrary and disparate treatment of similarly situated people."
See Chi's Federal Habeas Pet. at 26.  Though this assertion is
novel, the court is thoroughly unpersuaded that Bush v. Gore,
which involved the issue of equal protection in the election

process, has any relevance to the constitutionality of the death-penalty scheme in Texas.

VI.

Order

For the reasons discussed herein,

The court ORDERS that the petition be, and is hereby, denied.

SIGNED June 21, 2006.

___/s/ John McBryde_____
JOHN McBRYDE
United States District Judge

18